# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2020, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Catherine Brizzi
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.L. and J.R. (Minor Children)

and

J.L. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

January 31, 2020

Court of Appeals Case No.
19A-JT-1781

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1808-JT-953, - 954

**Crone, Judge.**

## Case Summary

[1]     J.L. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor children A.L. and J.L. (collectively "the Children"). We affirm.

## Facts and Procedural History

[2]     Mother is the biological mother of ten-year-old A.L and five-year-old J.R.[1] In August 2017, the Marion County Department of Child Services ("DCS") filed a child in need of services ("CHINS") petition regarding both Children alleging that Mother failed to provide the Children with a home free from violence and substance abuse. Following an initial hearing, the Children were removed from Mother's care.[2] The Children were adjudicated CHINS on December 1, 2017, after Mother admitted to the allegations in the CHINS petition. A dispositional hearing was held that same day, and the trial court ordered Mother to: (1) participate in home-based case management; (2) complete a substance abuse assessment; (3) submit to random drug and alcohol screens; and (4) ensure that the Children were participating in age-appropriate therapy. The permanency plan for the Children was reunification.

---

[1] A.L. and J.R. have different biological fathers, both of whom signed consents to adoption and were dismissed from the termination action.

[2] The Children were placed together in relative/kinship care in October 2017. (The placement was considered relative care for J.R. and kinship care for A.L.)

[3]     As part of home-based case management, Mother was referred for seventy parenting time sessions. She missed at least thirty-one of those sessions, admitting to service providers that she missed those sessions due to her methamphetamine addiction. Whenever Mother missed sessions, J.R. would become angry and scream and cry. Mother's behavior made A.L. feel unwanted. During some of the sessions that Mother did attend, she would engage in inappropriate conversations with the Children. Mother continued to be inconsistent with her attendance and, after she missed three consecutive sessions, her parenting time referral was closed unsuccessfully in April 2018.

[4]     Regarding substance abuse, home-based case manager Sara Franklin set one of Mother's goals as obtaining sobriety. Mother confirmed to Franklin that methamphetamine was her "drug of choice." Tr. Vol. 2 at 131. Franklin accompanied Mother to the Salvation Army substance abuse treatment program and stayed with Mother as long as she could. However, later that same day, Mother sent a text message to Franklin indicating that she would not participate in the Salvation Army treatment program. Mother further failed to participate in other offered treatment programs and, other than expressing a desire to obtain sobriety, she made no progress toward that goal. Although Mother was scheduled to submit to three drug screens per week, she submitted fewer than twenty drug screens during the pendency of this case and has not submitted any screens since January 2018.

[5]     A.L. reported that she did not feel safe when residing with Mother and that she had observed Mother and J.R.'s father using drugs. J.R. began receiving

therapy in March 2018. J.R. was diagnosed with post-traumatic stress disorder and attention deficit hyperactivity disorder. The therapist believes that J.R.'s trauma was caused by witnessing domestic violence and substance abuse in the home, as well as being removed from the home. J.R. is at a high risk for suicide, depression, and drug abuse. J.R. has made substantial progress since being removed from Mother's care and placed in a structured and stable environment.

[6] At some point, after being unsuccessfully discharged from several services, Mother completely stopped communicating with the DCS family case manager. In March 2018, Mother was charged with level 6 felony unlawful possession of a syringe, level 6 felony possession of a counterfeit instrument, and class C misdemeanor possession of paraphernalia. In August 2018, the trial court held a permanency hearing and, after hearing evidence regarding Mother's failure to participate in services, the court entered an order changing the Children's permanency plan from reunification to adoption. At the time of that hearing, Mother's whereabouts were unknown.

[7] On August 12, 2018, DCS filed a petition to terminate Mother's parental rights. The termination factfinding hearing took place over three days in February, May, and June 2019. Mother appeared on only one of those dates. On July 8,

2019, the court entered its order terminating Mother's parental rights. The trial court entered extensive findings of fact and concluded in relevant part that:[3]

> 51. There is a reasonable probability that the conditions that resulted in the [C]hildren's removal and continued placement outside the home will not be remedied by their mother. Mother has had over a year and a half to put forth an effort and has not done so. The [family case manager] has referred all court ordered services and Mother has completed none. Stability and sobriety remain major concerns.
>
> 52. Continuation of the parent-child relationship poses a threat to the [C]hildren's well-being in that it would serve as a barrier for them obtaining permanency through adoption when their mother is unable and unwilling to put forth an effort and parent. The [C]hildren would be traumatized if the [parent]-child relationship would continue. Both are happy in their current placement and both feel safe.
>
> 53. Termination of the parent[-]child relationship is in the best interests of the [C]hildren. Termination would allow them to be adopted into a stable and permanent home where their needs will be safely met.
>
> 54. There exists a satisfactory plan for the future care and treatment of the [C]hildren, that being adoption.
>
> 55. The Guardian ad Litem agrees with the permanency plan of adoption being in the [C]hildren's best interests.

---

[3] We have replaced any references to the parties' names with the aforementioned designations.

Appealed Order at 3. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate by clear and convincing evidence and therefore terminated Mother's parental rights. Mother now appeals.

## Discussion and Decision

[8] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[9] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re **R.J.**, **829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).***

# Section 1 – Clear and convincing evidence supports the trial court's conclusion that there is reasonable probability of unchanged conditions.

[10] Mother challenges the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied.[4] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with

---

[4] Mother also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Children's well-being. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.* Accordingly, we will address only one of the three requirements.

parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (citation omitted), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[11] Here, the Children were removed from Mother's care following her admission that they were CHINS. Specifically, the CHINS petition alleged that, among other things, Mother had failed to provide the Children with a home free from violence and illegal substance abuse, that Mother had continually tested positive for illegal drugs, and that Mother had failed to adequately address her substance abuse issues. Mother admitted that the coercive intervention of the court was necessary and that she needed the assistance of DCS to address her substance abuse issues. In its dispositional decree, the trial court ordered Mother to participate in home-based case management, complete a substance abuse assessment, submit to random drug and alcohol screens, and ensure that the Children were participating in age-appropriate therapy. The evidence indicates that Mother failed to comply with the trial court's order in that she has not completed any of the court-ordered services.

[12] First, as part of home-based case management, Mother was scheduled to have seventy parenting time sessions with the Children. However, she missed at

least thirty-one sessions. Mother admitted to service providers that she often missed the sessions due to her methamphetamine addiction. After three consecutive missed parenting time sessions, that referral was closed unsuccessfully, and Mother has not seen the Children since October 2018.

[13] As for Mother's substance abuse, the evidence indicates that DCS attempted to help Mother achieve sobriety through enrollment in a substance abuse treatment program. However, Mother left that program the same day she entered. Indeed, throughout the pendency of this case, Mother exhibited resistance to receiving any treatment whatsoever for her substance abuse. Further, Mother failed to comply with court-ordered drug screen requirements and, rather than submitting the required three drug screens per week, she submitted only twenty screens total over a two-year period. By all accounts, Mother has done nothing to address her admitted addiction issue in order to provide her Children with a safe and stable environment.

[14] Mother suggests that there is no evidence that her substance abuse is ongoing, and further that there is no evidence that she ever used drugs in front of the Children or that her substance abuse negatively affected the Children. First, a parent whose drug use led to a child's removal cannot be permitted to refuse to submit to drug testing, then later claim the DCS has failed to prove that the drug use has continued. *In re A.B.*, 924 N.E.2d 666, 671 (Ind. Ct. App. 2010). Moreover, A.L. testified that she witnessed Mother using drugs and that she had been asked to "pass a joint around" to Mother's friends. Tr. Vol. 2 at 72. Mother also asked A.L. to lie to DCS about her drug use, and A.L. reported

that she felt safer after Mother's parenting time was suspended. Contrary to Mother's suggestion, DCS presented ample evidence that Mother's substance abuse is ongoing and further that such abuse negatively affected the Children.

[15] The record supports the trial court's determination that there is a substantial probability of future neglect or deprivation based upon Mother's failure to participate in services and her habitual pattern of behavior. The trial court's conclusion that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied is supported by clear and convincing evidence.

### Section 2 – Clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the Children's best interests.

[16] Mother also challenges the trial court's conclusion that termination of her parental rights is in the Children's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id*. "[T]he historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best

interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[17] Here, home-based case worker Sara Franklin testified that, due to Mother's failure to cooperate with offered services, Mother had made no progress in reaching the set goals of achieving sobriety or obtaining employment and housing. Franklin emphasized Mother's continued substance abuse and how it severely and negatively affected Mother's ability to provide adequate care and supervision of the Children. Franklin stated that she felt that termination of Mother's parental rights was in the Children's best interests because Mother had not remedied any of the reasons for the Children's removal, and that a continuing relationship would be a threat to the Children's well-being.

[18] DCS family case manager Britney Richardson testified regarding Mother's noncompliance with ordered services, including parenting time, which was extremely hard on the Children. Richardson stated that in addition to Mother's strained relationship with the Children, she had made no progress in dealing with her substance abuse issues and that such failure made it impossible to provide the Children with stability. Richardson opined that termination of Mother's parental rights was in the Children's best interests and noted that "these [C]hildren have been through so much … they are now in a place where they are [] happy, they feel safe … they're able to just be kids …." Tr. Vol. 2 at 159.

[19] Similarly, guardian ad litem Christa Rodarte opined that termination of Mother's parental rights is in the Children's best interests. Rodarte noted that none of Mother's parenting "issues have been remedied" due to her failure to participate in services and to address her substance abuse. *Id.* at 185. Indeed, "no [service] providers" were "recommending that the [C]hildren be placed back in [Mother's] care." *Id.* Rodarte observed that DCS had been involved with the Children for almost two years and stated that it is not fair to leave the Children "in limbo" and that they instead "need some kind of permanent option" because "they have the right to be in one spot and know that they're going to be able to stay there." *Id.*

[20] As our supreme court has often stated, "[c]hildren have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *K.T.K.*, 989 N.E.2d at 1230 (quoting *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). Clear and convincing evidence supports the trial court's conclusion that termination of Mother's rights is in the Children's best interests.

## Section 3 – Clear and convincing evidence supports the trial court's conclusion that adoption is a satisfactory plan for the care and treatment of the Children.

[21] Finally, Mother challenges the trial court's conclusion that there is a satisfactory plan for the care and treatment of the Children. While the trial court must find that there is a satisfactory plan for the care and treatment of the child, "[t]his plan need not be detailed, so long as it offers a general sense of the

direction in which the child will be going after the parent-child relationship is terminated." *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). Generally, adoption is a satisfactory plan. *Id.*

[22] It is clear from the trial court's findings that the permanency plan here is for the Children to be adopted by their current relative/kinship care placement. The service providers were all in agreement that the Children had progressed and are thriving in that placement. Thus, there is clearly a general sense of direction in which the Children will be going after the parent-child relationship is terminated. Clear and convincing evidence supports the trial court's conclusion that adoption is a satisfactory plan for the care and treatment of the Children.

[23] Decisions to terminate parental rights "are among the most difficult our trial courts are called upon to make" and are very fact-sensitive. *E.M.*, 4 N.E.3d at 640. We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the trial court's termination of Mother's parental rights to the Children was clearly erroneous. Accordingly, the trial court's termination order is affirmed.

[24] Affirmed.

May, J., and Pyle, J., concur.